# Illinois Official Reports

## Appellate Court

---

### *People v. Bonaparte*, 2014 IL App (1st) 112209

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TROY BONAPARTE, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-11-2209 |
| Filed | March 4, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for involuntary servitude and trafficking in persons for forced labor or services were upheld on appeal, notwithstanding his contentions that his victims voluntarily worked for him as prostitutes and had opportunities to leave, since the victims' testimony allowed the jury to find that defendant was guilty beyond a reasonable doubt of both offenses, especially in view of their testimony concerning his recruitment of them for his prostitution business and the threats he made to prevent them from leaving. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-16175; the Hon. William G. Lacy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Maria A. Harrigan, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People. |

| Panel | PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion. |
| | Justices Simon and Pierce concurred in the judgment and opinion. |

**OPINION**

¶ 1    A jury found defendant Troy Bonaparte guilty of two counts of involuntary servitude, three counts of trafficking in persons for forced labor or services, and one count of pandering. Before this court, defendant challenges the sufficiency of the evidence used against him for his convictions for involuntary servitude and trafficking in persons for forced labor or services. Defendant did not challenge his conviction for pandering in his brief before this court. We hold the jury properly found defendant guilty of involuntary servitude and trafficking in persons for forced labor or services beyond a reasonable doubt. Accordingly, we affirm the judgment of the circuit court.

¶ 2                                    JURISDICTION

¶ 3    The circuit court sentenced defendant on July 12, 2011. Defendant timely filed his notice of appeal on the day he was sentenced. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

¶ 4                                    BACKGROUND

¶ 5    A jury found defendant guilty of two counts of involuntary servitude, three counts of trafficking in persons for forced labor or services, and one count of pandering. The following evidence was adduced at trial.

¶ 6    Brianna Holten testified on behalf of the State. Brianna testified that at the time of the offenses for which defendant was standing trial, she was 19 years old. She grew up in Boyceville, Wisconsin, "a small town" located in the northern section of the state approximately seven hours by car away from Chicago, Illinois. She left high school after her sophomore year, but later obtained a GED. Brianna testified that she had a learning disability. In April of 2010, she came to Chicago by bus to visit a friend. She was unable to reach her friend and stayed at the bus station "maybe a day or two." Brianna testified that at the station she gave all of her money away, including money for her return fare, to someone who told her that she needed money to go and see her children. Besides the person she was coming to see in Chicago, she did not know anyone in Chicago.

¶ 7    Eventually, a person named Sleepy offered her a place to stay. At Sleepy's she was confined to a basement and forced to have sex with people. She did not receive any money from these encounters. After approximately one week, Sleepy's friend took her to his cousin's house, where she stayed a "night or two." Brianna met T.J. at this time, who in turn

convinced Brianna to "[h]ave sex for money." T.J. gave Brianna half of what she earned, which Brianna saved in order to go back to Wisconsin and help her family.

¶ 8    After working for T.J. for several weeks, she met defendant, who called himself "Magnificent." Defendant asked her if she was working and whether he could talk with her. Brianna testified that defendant told her that "he could be better," she could keep half of the money, he would be nice to her, and he would "let [her] have [her] freedom." She agreed to work for him. For a night or two after she met defendant, Brianna had to work on the street for him. When asked what she was supposed to do on the street, Brianna testified that she was to "[s]tand on the corner and wait for someone to stop and get in." She was "hesitant" about working the street because she was not comfortable getting into cars with people she did not know. She told defendant that it was too dangerous for her, but he told her it would only be for a couple of days. Defendant then agreed to "post [her] on the internet." While she worked on the streets, Brianna would have to work at night for "four or five hours." Brianna did not keep the money the clients gave her, but, rather handed it over to defendant as he had instructed her to.

¶ 9    Defendant posted a profile of Brianna on the internet site "Backpage[.com]," which included pictures of Brianna and descriptions he had written. Defendant bought clothes for her and paid for the advertisement on Backpage.com. Defendant also bought Brianna a cell phone and posted the number on Backpage.com. Clients called her on the cell phone defendant provided her. The phone was supposed to be for business purposes only, but she also used it to call her family. Brianna testified that "[s]ometimes [defendant] would get mad if I would talk to them during working hours." When asked what her working hours were, Brianna testified they were "[w]henever he decided when I worked and when I stopped." She was able to speak with her family, but not for long or defendant would become angry. Defendant broke the first phone he had given her after they got into an argument while she was talking to her sister. Defendant threw the phone against the dashboard which cracked the phone's screen. Brianna testified that defendant raised his voice at her "[r]eally often," and stated that defendant "had a short temper," and "would get physical." The first physical altercation occurred a couple of days after she started working for him. Brianna testified:

> "We got into an altercation. I don't remember what the argument was about, but I remember saying shut up and he got mad and said I disrespected him and he got in my face. I tried to push him so he would get out of my face, and then he got really mad and hit me."

Brianna testified that defendant hit her in the face "two or three times" during that incident. Her face became bruised. When asked whether she had been hit before, Brianna testified that she had been physically abused by her father. After defendant hit her, she told him she was leaving. Brianna testified that defendant told her "[h]e was sorry and he wouldn't let his anger and aggression happen again." She believed him and so she continued to work for him. A couple of weeks later, however, Brianna and defendant began getting into arguments.

¶ 10    Brianna testified that in a night, the least amount of money she would make would be $500, whereas the most amount of money she would make was "[a] couple thousand maybe." Brianna testified that if defendant thought she was not making enough money, defendant became angry and hit her. Defendant mostly hit her in the face. She estimated that defendant physically abused her four or five times a month. Defendant gave her several rules she had to follow, the first of which was to make money. She also had to "[k]eep the other girls in line,

take their calls." She testified the other girls would come and go, but that one particular girl, Jessica, stayed for a couple of weeks prior to defendant's arrest. Brianna testified that she never called the police when defendant became physically abusive toward her because she feared that defendant would hurt her. She explained that she did not call the police because she lived with defendant and she worried that the police might take "too long or something." She answered "Yeah," when asked if defendant ever drew blood from her face. She recalled that she bled from her mouth and nose after an argument in a hotel. While she was bleeding, defendant told her "not to make a mess." He did not call an ambulance or take her to the hospital. She did not call the police when she was alone outside of defendant's presence because she "didn't want to take a risk in hurting myself." She then clarified that it was "[n]ot really me hurting myself but take a risk he walk in by the time I called." She thought that he would hurt her. She did try once to leave defendant, and had her bags packed and was ready to go, but defendant convinced her to talk to him in a bathroom. He told her he did not want her to go. While in the bathroom, he slapped her in the face. She did not end up leaving. Brianna testified that defendant never paid her, but did take her shopping for "[c]lothes, bras, panties, [and to] get our nails done." Defendant would also always buy toiletries and condoms. Brianna always insisted that her clients wore condoms, but defendant advertised that she would do "bareback," which she described as sex "[w]ithout a condom." She did not mind that defendant advertised as such, as long as she did not "have to do it." She told defendant this, which he was "all right with," because defendant thought of it as a way to attract clients.

¶ 11    On two occasions, Brianna traveled with defendant to her home in Wisconsin for a pending court case. Defendant brought her to her mother's house. Brianna testified that on both occasions, defendant instructed her "[t]o stay the night and call him right away after court and he would come pick [her] up." Brianna told her sister that defendant had been physically abusive to her. She testified that she returned to Chicago with defendant because she feared that he would "get physical" with her. She testified further that she "didn't want him–the chance something would happen to [her] family, so [she] would always agree" to return to Chicago with him. She testified that she was making a lot of money, the most out of all the girls, for defendant at that time. She did not believe that her family could help her. Defendant always told her that he "cared" about her and that he could eventually see them dating each other in the future.

¶ 12    Brianna testified that once Jessica arrived she felt better. She testified that they "hit it off right away" and that they "got along." Prior to Jessica's arrival, Brianna testified that working for defendant "was hard," but that it improved with Jessica's arrival because defendant "wasn't always yelling at" her. With the exception of the incident in the bathroom, defendant no longer became physical with her after Jessica came. Defendant would still yell at her and Jessica though.

¶ 13    On August 17, 2010, Brianna was at the Super 8 motel on Touhy Avenue and Elmhurst Road. Defendant rented two rooms, one where they slept and one for "working." If clients came at the same time, the room they slept in would be used for working and defendant would go to his car or the lobby. On that date, Jessica took a phone call for her in response to an advertisement on Backpage.com. Brianna unknowingly agreed to have sex in exchange for money with an undercover police officer. After the officer told her that she would be arrested, she initially refused to speak with him because defendant had told her not to talk to

a police officer if stopped or to reveal who he was. Jessica convinced her to talk. The police officers indicated to her that defendant had been placed under arrest. After going to the police station, she went back to Wisconsin. She testified that the State paid for her food, lodging, and travel expenses in exchange for her testimony.

¶ 14     The State entered into evidence an exhibit showing Brianna's advertisement on Backpage.com. Brianna testified the photographs in the exhibit were of her, but that defendant had written the text contained in the advertisement. The State also entered into evidence Brianna's notebook containing phone numbers of her clients. She explained the documentation procedure she used in the notebook, stating:

> "The clients would call on your cell phone and you would write it down, try to get the first name, what time they want to come, how much, how long they want to spend with you and how much."

Brianna testified that the notebook insured that she did not "overbook" herself. She was not the only person who wrote in the notebook, Jessica and defendant also wrote in the notebook.

¶ 15     During cross-examination, Brianna testified that during both trips to Wisconsin, defendant left her alone with her family while he went to Minneapolis by himself. She estimated that once defendant dropped her off, she was alone "[t]hat night and the next day until [her] court case was done and then [she] called him right away." The first time defendant left her alone with her family was in June when Brianna had known defendant two weeks and the second time was in July. During both trips, defendant left her alone with her family for "[a] night and a day." When asked whether the time period was "under 24 hours," Brianna agreed that it was.

¶ 16     Brianna testified that during her first two nights in Chicago, she called her father to ask for bus fare home, but he did not answer. Brianna testified that while she worked for T.J., she made approximately $1,000 a night, and was able to keep half, $500. She estimated that she made "[a] couple of thousand" dollars over a two-week time period. She also explained that T.J. did not want her to return home for her court case, but that defendant told her that he would take her home and that he would help her out with the case. She stated that she "figured it was a better opportunity." Brianna testified that she had no money when she met defendant because she spent the money she had on posting bail for T.J., who had been arrested. Brianna also agreed that it was her idea to work on the Internet because she did not feel comfortable working on the streets. Brianna testified that, while working for T.J., she had advertised on the Internet. Brianna also explained that when she worked for defendant through the Internet, her working hours varied according to how busy it was. Defendant did not mind if she spoke to her family if it was not busy that day. When asked how many times she talked with her family on the phone from May, when she met defendant, until mid-August, when defendant was arrested, Brianna answered: "Maybe 10, 20. I don't remember how many times I talked to them." She did estimate that she spoke to her family in "short" conversations approximately five times per week.

¶ 17     Brianna testified that she took "outcalls," which required her to travel to the client's location. It was up to defendant, however, to decide whether she was able to go or not. She testified that she was scared of what defendant would do if she called the police and there was not enough evidence or they were not able to arrest him. She did not go to the hospital for any of the injuries defendant inflicted on her. She hid the bruises with makeup. At one point, Brianna took pictures of herself and sent them to her mother. Her mother told her to

come home when she saw the pictures. Her mother did not call the police. Rather, she and Brianna's brother called the "Steve Wilkos Show." Brianna testified that the show contacted her, Jessica, and defendant. Brianna's brother had seen her advertisement on Backpage.com. The only money Brianna received from defendant was money defendant left so that she and Jessica could get food. When asked why she never set aside money for herself, she answered that defendant "knew how much we made." She tried to leave several times, but defendant always convinced her to stay. She estimated that she had 10 clients a day when she worked the streets, but had more than ten per day when she advertised on the Internet. Brianna was not charged in this matter with prostitution.

¶ 18        On redirect examination, Brianna testified that she did not call her mother from the bus station when she initially arrived in Chicago because she "was not particularly close with [her] family" except for her sister. She testified that her father had money, but was "violent." Her mother never had money. When asked why she returned to Chicago with defendant after going to Wisconsin, she answered "[s]o my family and I could stay safe." She also testified that she never contacted the police because she feared defendant would get "[p]hysical" with her. She also testified that neither she, Jessica, nor defendant wanted to go on the Steve Wilkos Show. She did not want to risk being physically hurt by appearing on the show.

¶ 19        Jessica Lynn Nelson testified on behalf of the State. She stated she was 30 years old and grew up in Minnesota. Her mother passed away when she was 10, and, thereafter, she stayed in group homes until she was 20. She testified that she had been convicted of felony receipt and possession of stolen property prior to her move to Chicago in 2009. In August of 2009, she came to Chicago. She testified that she "stayed at different people['s] houses" that she met, and that at this time she was "[p]artying, drinking." Jessica testified that she met defendant at "90th and King Drive." Defendant was in his car, a white Cadillac. Jessica went out to eat with defendant. She testified that she "trusted" defendant because "[h]e seemed like a nice person, so I told him about myself." Jessica told defendant about her mental issues and about her family. Jessica testified defendant responded in a "kind and caring" way. Jessica described how defendant told her about his business, stating that defendant "told me that he has a female that works for him and that with me telling him I had money issues he asked–told me that he could help with that." Defendant then explained to Jessica that he would post pictures of her on Backpage.com and that clients would meet her in a hotel room. Defendant then brought her to a hotel room where she had sex with people in exchange for money.

¶ 20        Defendant introduced Jessica to another woman, "Crystal," who defendant stated was his girlfriend. Crystal's real name was Brianna. Jessica testified that the agreement with defendant was that she worked for him and that she was to receive half of the proceeds. Defendant bought her clothes to wear. When she earned money from clients, she gave the money directly to defendant. She did not keep her half because it was defendant's "job." Defendant, however, never gave her her half. She testified that she was charging people $100 to $125. She worked a total of two weeks for defendant. She described the schedule, stating that she would normally answer the phone and work the overnight shift while Brianna slept at night; whereas Brianna usually worked during the day while Jessica slept. Jessica explained that defendant created an advertisement, complete with pictures of her, and posted it on Backpage.com. Potential clients would then call the cell phone number provided in the posting. Jessica testified that every time she received money from a client, she gave it to

defendant because she "was scared not to." She testified that defendant threatened her and would yell at her "[p]retty much every day."

¶ 21     Jessica testified that a typical work day involved waking up at "8, 9 o'clock" and then walking over to Burger King or Subway to pick up food with the $20 defendant would leave for them. She testified that "as soon as we were done eating the phone was turned on and we were at work." She estimated that they started to work at 10 or 11 in the morning. They worked "[u]ntil the calls stopped," which "could be 2 to 6 o'clock in the morning." She was bothered that defendant never gave her half of the money. When she told defendant she wanted her share of the money, they got into a big argument. Jessica testified that defendant told her that it was not her "place to have money" and that "he would give me what he thought I deserved." She testified that she was scared to leave defendant. She stated that she "had been physically abused before and he just scared me." When asked why she never called the police, she answered that defendant told her that she would die if she called the police.

¶ 22     Jessica testified that defendant treated Brianna as "the queen of the world" because she was his girlfriend and she made the most money. She never saw defendant physically abuse Brianna, but she did see Brianna attempt to leave defendant. When Brianna tried to go to the door, defendant "pulled her into the bathroom and shut the door." Jessica heard defendant yelling at Brianna and then she heard him slap her. When Brianna came out of the bathroom, she had a red mark on the side of her face.

¶ 23     On August 17, 2010, Jessica was at the Super 8 motel at Touhy Avenue and Elmhurst Road in a room with defendant. As she was sitting on the bed she heard knocking on the door. Defendant responded by locking the door with the dead bolt and chain. First a security guard asked to talk and then the Chicago police announced their office. Defendant refused to open the door and did not allow Jessica to open the door. Jessica testified that defendant told her "to stay in [her] bed and keep [her] mouth shut." Eventually the police entered the room and removed defendant. She directed the police to defendant's camera and computer, which they confiscated. At that time, Jessica had no money on her.

¶ 24     After defendant's arrest, Jessica returned to Minnesota, where there was an outstanding warrant for her arrest. Following her arrest and conviction, she was sentenced to 5 months, 26 days in prison. Jessica testified that she is an alcoholic and she received treatment for alcoholism while in prison. Defendant did not know that she was an alcoholic, but he did buy her alcohol. Jessica was aware that she was an alcoholic, but stated that she "didn't want to admit it." She testified that defendant "kept" her drunk so that she would not leave. Defendant gave her four or five shots of tequila every three or four hours a day.

¶ 25     On cross-examination, Jessica testified that prior to meeting defendant she did not know who he was, but that he knew who she was based on a reference from a mutual friend, "Major"; whom she met when she moved to Chicago. She admitted to previously being a prostitute, which she testified as "a couple of times to get some money in Minnesota." She testified that she was only a prostitute for one night, and it was "at least five years ago." She clarified that she only knew defendant two weeks before he was arrested. Defendant ordered Jessica to have sexual relations with him, but she refused. He did not hit her when she refused. She also testified that during the two-week period she knew defendant, she was always drunk. When asked by defense counsel if she was afraid to leave defendant due to being physically afraid of him or because of drunkenness, Jessica answered that she "was

physically afraid of him." Like Brianna, Jessica was not charged with prostitution in this matter.

¶ 26    Officer Andrea Walker of the vice control section of the organized crime division of the Chicago police department testified on behalf of the State regarding a prior incident where she was part of a team that arrested defendant. On June 24, 2010, Officer Walker was in Franklin Park, Illinois, helping the Cook County sheriff's office and the Franklin Park police department. On that day, she was working undercover as a prostitute. As she walked up and down the street, she was approached by a white Cadillac driven by defendant. Defendant blocked her path with the car and began making "small talk" with her. When defendant asked her what she was doing, Officer Walker told him that she was "working." She defined someone who was "working" as someone "working the street, trying to make money, working giving sexual favors in exchange for some form of cash, or something of value, money, jewelry, food." Defendant complimented her on her appearance and gave her advice on what she should be wearing on the street. Defendant inspected her with his eyes and asked to see her hands. Defendant told her that his name was "Magnificent." She let defendant inspect her hands thoroughly. Officer Walker testified that defendant "started saying where he was from, and he's from New York, and he and his players working out there, and now they are coming over here." She defined a "player" as someone "working the streets using the girls. They are either pimps or somehow manipulating the girls in some way." Defendant asked Officer Walker if she was affiliated with anyone by asking her if she had a "daddy," which she defined as having a pimp. Officer Walker responded to defendant stating that she was "independent." Defendant told her that she needed someone to take care of her and offered to take her in the car and talk somewhere. Defendant proceeded to ask her for her phone number, but Officer Walker told him that she did not have one. Defendant, however, continued to insist that she get into his car to talk. Defendant gave her his phone number and Officer Walker walked away from defendant's vehicle. Officer Walker signaled to the other members of her team, who then arrested defendant.

¶ 27    Officer Brian Hawkins of the Chicago police department testified on behalf of the State regarding defendant's arrest on June 24, 2010. His testimony was consistent with Officer Walker's testimony. He added that defendant agreed to speak with him and stated that he was "a pimp."

¶ 28    Robert Gassman, an investigator with the Cook County sheriff's police department's vice unit testified on behalf of the State. Investigator Gassman testified that his unit investigates prostitution activities, mainly through the Internet. He explained that the website Backpage.com is "an electronic classified ads." Investigator Gassman testified that his unit reviews the "Adult Entertainment Section" of the website and looks at advertisements that include photographs, written text that describes prices, locations, phone numbers and names. On August 17, 2010, he was part of a team investigating an advertisement on Backpage.com with Sergeant Leen and Investigators Shaller and Fourte. He described how he, after viewing an advertisement on Backpage.com, called a phone number listed whereupon he asked the female who answered the phone whether she was available for "a date." He testified that "a date" meant a "[s]exual encounter" that involved the transfer of money. The female voice agreed, an amount of money was discussed, and he was directed to go to the intersection of Elmhurst and Touhy and call the number on the advertisement. He stated it is common in his experience as a vice investigator to be instructed to first go to an intersection before receiving

more specific directions upon arrival. Once he arrived at the intersection, he again called the number and the female voice instructed him to go to the Super 8 motel. He was then instructed to call the number again upon arrival at the motel, which he did. He was instructed to go to room 219. Investigator Gassman was dressed casually, in an undercover capacity. Brianna Holten answered the door and asked him what he was interested in. Investigator Gassman described a sexual act and a price of $150 was agreed upon. He asked her if she had any condoms available, and she retrieved one from the night stand. Brianna handed Investigator Gassman the condom and Gassman handed her the $150. At that point, Investigator Gassman identified himself as a police officer and stated to Brianna that she was under arrest for prostitution. He opened the door to the room and let Investigators Shaller and Fourte into the room. Brianna told the officers that a friend had rented the room. Based on that information, Investigator Gassman contacted Sergeant Leen, who was in the lobby of the motel. Investigator Gassman then began looking for defendant in room 220, which was located directly across from room 219. Jessica Nelson and defendant were in room 220. Neither of the women had any money on them. Investigator Gassman testified that they provided Jessica and Brianna housing until they could provide them with transportation home to Minnesota and Wisconsin. On cross-examination, Investigator Gassman testified that Jessica Nelson was not, and did not appear, intoxicated at the time of defendant's arrest.

¶ 29    Investigator Kevin Fourte of the Cook County Sheriff's police vice unit testified on behalf of the State. He was part of the team that arrested defendant on August 17, 2010 and testified consistently with Investigator Gassman's account of the events that led to defendant's arrest. Investigator Fourte added that inside room 220, they found notebooks and planners, and a laptop computer. After a conversation with Jessica Nelson, the team then went to another location, the Baymont Hotel, where they found Nadya Al Houti and Sarah Wesley. On cross-examination, Investigator Fourte also testified that Jessica Nelson did not appear intoxicated at the time of defendant's arrest.

¶ 30    Nadya Al Houti testified on behalf of the State. On August 16, 2010, Al Houti was living on the streets with her girlfriend, Sarah Wesley. While in the area of Manheim and Fullerton, defendant approached her and her girlfriend. After a 10- or 15-minute conversation, defendant asked them to go to the Super 8 motel with him to "hang out." Al Houti testified that she explained to defendant at the motel that she and her girlfriend were "struggling really hard" and were homeless and were not eating. Al Houti stated that if she worked for defendant as a prostitute he would post pictures of her on the Internet. She agreed to this, and testified that her terms were that she got to keep half of the money, that he could not control her or verbally harass her, that her girlfriend would be with her at all times, and that she could leave at any time. Defendant agreed to this arrangement. She informed defendant that she would do the pictures, but that she did not have any clothes. Defendant then took her to buy "clothes and heels," which she described as "nice shirts" and "some lingerie." Defendant then paid for a room for her and her girlfriend at the Baymont hotel. An hour later, defendant took pictures of Al Houti and posted the pictures on Backpage.com. He instructed her that he would call her when the first date called. A couple of hours later, a female voice called and told her that defendant would come pick her up. Defendant brought her to the Super 8 motel, where she engaged in sex for money with a client. She received "three or four" more clients that evening. She kept half of the money she received and gave defendant the other half. Around 10:30 that evening, while in the Baymont hotel with Sarah, defendant called her and

told her not to open the door for the police and that Brianna was in jail. She testified defendant sounded "nervous" and "scared." A couple of hours later, the police came to the door and her girlfriend let them in. She identified in open court the advertisement that defendant posted showing pictures of her on Backpage.com.

¶ 31    On cross-examination, she testified that defendant first brought up the topic of prostitution. Al Houti testified:

> "I asked him what he did and stuff like that, and he told me that he had a couple of girls working for him, and he posted them and they made money or whatever, and then he asked me if I would want to do that, and I agreed to him, but I told him my terms, that I was not going to give him all my money, and whenever I wanted to leave, I was going to go, and he wasn't going to like, you know, put his hands on me."

Al Houti testified that prior to meeting defendant, she had never worked as a prostitute.

¶ 32    Investigator Dan Schaller of the Cook County sheriff's police vice unit testified on behalf of the State. On August 17, 2010, he was part of the team that arrested defendant. He searched defendant and found miscellaneous papers, a driver's license, and approximately $2,700 in cash.

¶ 33    The parties stipulated to the following, as read into the record:

> "People's exhibit *** No. 14 *** is a group exhibit of records from the Super 8 *** motel located at 2951 Touhy Avenue in Elk Grove Village, Illinois. The documents show that bedrooms 219 and 220 were rented by [defendant] *** in August, and also for August 17th, 2010.

> People's exhibit No. 15 is a receipt for Room 106 at Baymont Inn & Suites of O'Hare located at 2881 Touhy Avenue in Elk Grove Village, Illinois. The receipt shows the name of the party renting the room for August 17, 2010 was [defendant] ***.

> Backpage.com is an Internet website which provides the opportunity to individuals who post free classified ads with pictures, as well as ads that can be run continuously for a fee. The website Backpage.com has an adult section that contains a section for escorts. People's exhibit No. 16 are copies of the ads posted to that particular section. People's Group Exhibit 17 are duplicates of those ads but also include the administrative date for those ads. The administrative date includes the type of ad, the ad price, whether it was paid for, the name and email used to create the ad, and whether the ad was modified and by whom that was done. These particular ads were created by [defendant] using troyforever@yahoo.com.

> Backpage.com also keeps an invoice for the ads which shows that invoice date, the partner and category that the ad is in, the name, the email, and name and address of the individual who paid for the ad. These particular records show that [defendant] *** paid for numerous ads using Chicago Backpage.com in the adult entertainment section under escorts. Each particular ad reflects the ad name.

> Backpage.com also keeps user information for each particular ad. The documents also reflect a class user and shows the email troyforever81@yahoo.com was used by [defendant] ***.

A search of the contents in the computer in Exhibit 6 and cameras recovered in the hotel where the Defendant was present was done by Chicago Regional Computer Forensic Laboratory. The search showed the individual who registered the computer and the computer's registered owner was 'magnificent.' People's Exhibit No. 18 and 19 are DVDs of the images recovered from the computer and camera. Several images recovered from the computer and cameras and placed on DVDs are the same images used in the Backpage.com ads in People's 1, 3, and 7."

¶ 34 After the State rested, defendant made a motion for a directed verdict, which the circuit court denied. Defendant then rested. Defendant motioned for a directed finding, which the circuit court denied. Following deliberations, the jury found defendant guilty of two counts of involuntary servitude, three counts of trafficking in persons for forced labor or services, and one count of pandering.

¶ 35 After trial, defendant filed a *pro se* motion alleging ineffective assistance of counsel, which the circuit court denied. Later, defendant, with the assistance of counsel, filed a motion for a new trial, which the circuit court also denied. After a sentencing hearing, the circuit court sentenced defendant to 3 years in prison for pandering, 11 years for trafficking, and 18 years in prison for involuntary servitude with all sentences to be served concurrently.

¶ 36 Defendant timely appealed.

¶ 37                                    ANALYSIS

¶ 38 Before this court, defendant challenges the sufficiency of the evidence used against him for his convictions for involuntary servitude and trafficking in forced labor. According to defendant, the State failed to prove the elements of both convictions as they pertain to his conduct toward Brianna Holten and Jessica Nelson beyond a reasonable doubt because both women's testimony that they were forced to work as prostitutes under the threat of actual or physical harm was contradicted by evidence that both women voluntarily worked for him and had opportunities to leave him. Defendant raises no argument before this court regarding his conviction for pandering.

¶ 39 In response, the State argues that the jury properly found defendant guilty of involuntary servitude and trafficking in persons for forced labor or services beyond a reasonable doubt. The State maintains that the totality of the evidence established at trial, including all reasonable inferences drawn from the evidence, shows that the jury properly found defendant guilty of both offenses.

¶ 40 The due process clause of the fourteenth amendment to the United States Constitution insures that an accused defendant is not convicted of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *People v. Carpenter*, 228 Ill. 2d 250, 264 (2008); see also *People v. Ehlert*, 211 Ill. 2d 192, 213 (2004) ("Simply stated, the fact that defendant is 'probably' guilty does not equate with guilt beyond a reasonable doubt."). It is not, however, the function of this court to retry a defendant when reviewing whether the evidence at trial was sufficient to sustain a conviction. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our review is focused on "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *People v. Baskerville*, 2012 IL 111056, ¶ 31. This

- 11 -

standard of review applies to both circumstantial and direct evidence. *Ehlert*, 211 Ill. 2d at 202.

¶ 41 The trier of fact is responsible for determining a witness's credibility and the weight to be given to a witness's testimony, as well as drawing any reasonable inferences from the evidence. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Although all reasonable inferences in the record must be given in the prosecution's favor, unreasonable inferences will not be allowed. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). The trier of fact, however, is in the best position to resolve any conflicting inferences produced by the evidence. *People v. McDonald*, 168 Ill. 2d 420, 447 (1995). Further, "the trier of fact is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Id.*; see also *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009) ("the trier of fact is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt"). A defendant's conviction will not be reversed "simply because the evidence is contradictory [citation] or because the defendant claims that a witness was not credible." *Id.* at 228. "The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The findings of the trier of fact are given great weight because it saw and heard the witnesses. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). Although the trier of fact is accorded great deference, its decision is not binding or conclusive. *Id.* at 115. As such, a conviction will be reversed where the evidence is so unsatisfactory, unreasonable or improbable that it raises a reasonable doubt as to defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 42 Section 10-9 of the Criminal Code of 1961 (Code) defines both the offense of involuntary servitude and the offense of trafficking in persons for forced labor or services. 720 ILCS 5/10-9 (West 2010).

¶ 43                                    Involuntary Servitude

¶ 44 Involuntary servitude is defined by the Code, in relevant part, as follows:

"A person commits the offense of involuntary servitude when he or she knowingly subjects, attempts to subject, or engages in a conspiracy to subject another person to forced labor or services and:

(1) causes or threatens to cause physical harm to any person[.]" 720 ILCS 5/10-9(b)(1) (West 2010).

Section 10-9 of the Code defines the term "labor" as "work of economic or financial value." 720 ILCS 5/10-9(a)(5) (West 2010). The term "forced labor or services" is defined, in relevant part, by section 10-9 as "labor or services that are performed or provided by another person and are obtained or maintained through *** any scheme, plan, or pattern intending to cause or threatening to cause serous harm to any person." 720 ILCS 5/10-9(a)(4)(A) (West 2010). The term "maintain," as used in section 10-9 in relation to labor or services, is defined as "to secure continued performance thereof, regardless of any initial agreement on the part of the victim to perform that type of service." 720 ILCS 5/10-9(a)(6) (West 2010). Section 10-9 defines the term "services" as such:

" 'Services' means activities resulting from a relationship between a person and the actor in which the person performs activities under the supervision of or for the benefit of the actor. Commercial sexual activity and sexually-explicit performances are forms of activities that are 'services' under this Section." 720 ILCS 5/10-9(a)(8) (West 2010).

¶ 45    Regarding his actions toward Brianna Holten, defendant argues that Brianna's testimony was contradicted by the evidence that she visited family in Wisconsin, but still returned with defendant to Chicago. Defendant also points to Jessica's testimony that she never saw defendant hit Brianna. Regarding his actions toward Jessica Nelson, defendant contends that Jessica's testimony established that he never hit her and that although he provided her with alcohol, he did not force her to drink alcohol. After reviewing the evidence in the light most favorable to the State, we hold the State proved beyond a reasonable doubt that defendant committed the offense of involuntary servitude as to both Brianna and Jessica.

¶ 46    In regard to Brianna, her own testimony established that defendant subjected her to forced labor or services and that defendant both caused and threatened to cause serious harm to her. Brianna testified that defendant was both verbally and physically abusive toward her. She stated that he hit her and described her injuries. She attempted to leave defendant, but he would convince her to stay. She also testified that she did not call the police because she was scared defendant would harm her or her family. Brianna originally agreed to work for defendant because he would allow her more freedom and allow her to keep half of the money she received from clients. Defendant initially made Brianna work on the streets, which she felt uncomfortable with. He agreed to post her on the Internet on an online classifieds website. Defendant subsequently took pictures of Brianna and provided the text of the advertisement. Brianna testified how she had no money and that defendant decided what her working hours were and whether she could go on an "outcall." She also explained how clients would call the phone defendant provided. Although defendant would pay for the hotel rooms, food, and various clothing and toiletries, he never gave Brianna her agreed-upon share of the proceeds. She testified defendant had instructed her to give him the money. Jessica Nelson also testified as to an incident where Brianna attempted to leave and defendant "pulled her into the bathroom and shut the door." Jessica heard defendant yelling at Brianna and then she heard a slap sound. When Brianna exited the bathroom, she had a red mark on the side of her face. Brianna's testimony, supplemented with Jessica's description of an incident where Brianna attempted to leave defendant, has provided the necessary facts to allow a rational trier of fact to find the essential elements of the crime of involuntary servitude beyond a reasonable doubt. Accordingly, we cannot say that the jury erred when it found defendant guilty of involuntary servitude based on his conduct toward Brianna.

¶ 47    Defendant maintains that Brianna's testimony provided the only evidence of the offense and that her testimony was contradicted by the fact that he allowed her to go to Wisconsin and stay at her family's house on two occasions. We hold defendant's argument has no merit. Brianna testified that in both instances, she was only at her home for periods less than 24 hours. Defendant instructed her to call him right after her court appearance concluded so that he could pick her up. She further testified that she returned to Chicago with defendant because she feared for both her own and her family's safety. We note that it is the role of the trier of fact to resolve any conflicting inferences from the evidence. *McDonald*, 168 Ill. 2d at 447. Furthermore, reasonable inferences in the record must be given in the prosecution's

favor. *Cunningham*, 212 Ill. 2d at 280. Additionally, the testimony of a single credible witness is sufficient to maintain a conviction. *Smith*, 185 Ill. 2d at 541. We do not think that Brianna's explanation regarding why she did not leave defendant while in Wisconsin is so unreasonable that it raises a reasonable doubt of defendant's guilt. Defendant also argues that Jessica never saw him hit Brianna and, therefore, this contradicts Brianna's testimony. We disagree. Although Jessica testified that she never saw defendant hit Brianna, Jessica also testified that she heard defendant yell at Brianna and then heard him slap her. Jessica also only worked with defendant for two weeks. Furthermore, Brianna herself testified that once Jessica arrived, defendant stopped physically abusing her. Accordingly, defendant's arguments before this court fail to show that the evidence in this case was so unreasonable that there is a reasonable doubt to his guilt.

¶ 48    Similarly, in regard to Jessica, her own testimony established the elements of the crime of involuntary servitude. Like Brianna, Jessica agreed to work for defendant based on defendant agreeing to letting her keep half of the proceeds. She testified that defendant brought her to a hotel room where she "was paid for sex for money." Jessica testified as to how defendant posted pictures of her on Backpage.com and provided her with a phone for clients to call. She testified that when she received money from a client, she gave it to defendant because she "was scared not to." She stated that defendant threatened her, that he yelled at her daily, and that she was scared to leave him. He told her she would die if she called the police. When she asked him for her half of the proceeds, defendant refused. She also believed that defendant "kept" her drunk so that she would not leave. We hold that Jessica's testimony provided the necessary facts to allow a rational trier of fact to find the essential elements of the crime of involuntary servitude beyond a reasonable doubt. Her testimony showed that defendant subjected Jessica into a commercial sexual activity and threatened to harm her. Accordingly, we cannot say that the jury erred when it found defendant guilty of involuntary servitude based on his conduct toward Jessica.

¶ 49                    Trafficking in Persons for Forced Labor or Services

¶ 50    Defendant challenges his conviction before this court for trafficking in persons for forced labor solely on the argument that the State failed to prove beyond a reasonable doubt that Brianna Holten and Jessica Nelson were subjected to or threatened with serious harm.

¶ 51    Trafficking in persons for forced labor or services, is defined by the Code, in relevant part, as follows:

> "A person commits the offense of trafficking in persons for forced labor or services when he or she knowingly: (1) recruits, entices, harbors, transports, provides, or obtains by any means, or attempts to recruit, entice, harbor, transport, provide, or obtain by any means, another person, intending or knowing that the person will be subjected to forced labor or services; or (2) benefits, financially or by receiving anything of value, from participation in a venture that has engaged in an act of involuntary servitude ***." 720 ILCS 5/10-9(d) (West 2010).

As discussed above, section 10-9 defines the term "labor" as "work of economic or financial value" (720 ILCS 5/10-9(a)(5) (West 2010)) and the term services as "activities resulting from a relationship between a person and the actor in which the person performs activities under the supervision of or benefit of the actor" (720 ILCS 5/10-9(a)(8) (West 2010)).

- 14 -

Section 10-9 specifically includes commercial sexual activity under its definition of "services." 720 ILCS 5/10-9(a)(8) (West 2010). The term "forced labor or services" is defined, in relevant part, by section 10-9 as "labor or services that are performed or provided by another person and are obtained or maintained through *** any scheme, plan, or pattern intending to cause or threatening to cause serious harm to any person." 720 ILCS 5/10-9(a)(4)(A) (West 2010). Additionally, section 10-9 defines a trafficking victim as someone who is subjected to the practices of involuntary servitude, involuntary servitude of a minor, or trafficking in persons for forced labor or services. 720 ILCS 5/10-9(a)(10) (West 2010).

¶ 52 Initially we note that defendant's argument before this court is based solely on his contention that the evidence did not establish that either woman was subjected to serious harm or a threat to serious harm. Defendant raises no argument concerning whether he recruited either woman or whether he benefitted financially from their services. See 720 ILCS 5/10-9(d) (West 2010). Defendant also points out that to prove one type of trafficking in persons for forced labor or services, referred to here by the parties and the circuit court as "Type B," an act of involuntary servitude is required. See 720 ILCS 5/10-9(d)(2) (West 2010) ("A person commits the offense of trafficking in persons for forced labor or services when he or she knowingly *** benefits, financially or by receiving anything of value, from participation in a venture that has engaged in an act of involuntary servitude ***."). He reiterates his previous argument used to address his conviction for involuntary servitude that he cannot be guilty of this type of trafficking for forced labor or services because the State failed to prove the element of involuntary servitude. It follows that based on our holding that the State proved defendant guilty of involuntary servitude beyond a reasonable doubt, that defendant's argument here that he cannot be convicted of "Type B" trafficking in persons for forced labor or services because the State failed to prove the element of involuntary servitude is without merit. Accordingly, with that in mind, we will address defendant's only remaining argument, *i.e.*, his contention that neither Brianna Holten's testimony nor Jessica Nelson's testimony established that either woman was subjected to serious harm or the threat of serious harm.

¶ 53 We hold defendant's remaining argument is also without merit as both Brianna and Jessica provided testimony establishing that defendant either physically harmed them or threatened to do so. Both women testified they were scared of defendant, thus establishing that defendant threatened them. Brianna explained how defendant yelled at her and physically abused her. She testified defendant's abuse caused her to bleed and that she had to cover her injuries with make-up. Brianna testified she feared for both her own and her family's safety. Jessica testified that defendant yelled at her "[p]retty much everyday," and that she was scared to not give him all of the proceeds given to her by clients. She testified further that she was scared to leave defendant because she had been abused before and defendant had told her that she would die if she called the police. Based on both Brianna Holten's and Jessica Nelson's testimony, we hold the State did provide proof beyond a reasonable doubt that defendant either physically harmed or threatened to physically harm both women.

¶ 54 Regarding the remaining elements of the crime of trafficking in persons for forced labor or services, we hold the State provided evidence establishing proof of the crime beyond a reasonable doubt. Both women provided testimony explaining how defendant recruited them

and how he operated the prostitution business. They offered similar testimony concerning how he approached them, offered them half of the proceeds, then bought them clothing and posted their profiles on an online classifieds website. He provided both women with cell phones for clients to call and rented hotel rooms. Both women also testified how defendant received all of the money they received from the clients. Accordingly, based on the evidence presented at trial, in addition to the reasonable inferences drawn from the evidence, we hold that a rational trier of fact could find that defendant committed the offense of trafficking in persons for forced labor or services.

¶ 55                                                          CONCLUSION

¶ 56          The judgment of the circuit court is affirmed.

¶ 57          Affirmed.