2025 IL App (1st) 231606-U

No. 1-23-1606

Order filed June 9, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 02305 |
| | ) | |
| CLINTON ROBINSON, | ) | The Honorable |
| | ) | Pamela Stratigakis, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for aggravated battery with a firearm is affirmed where the State disproved his self-defense claim.

¶ 2    Following a jury trial, defendant Clinton Robinson was found guilty of one count of aggravated battery with a firearm and sentenced to nine years in prison. On appeal, defendant argues that the State failed to prove beyond a reasonable doubt that he was not acting in self-defense. We affirm.

¶ 3    Defendant was charged by indictment with three counts of attempted murder of Nikel Webster (Nikel), two counts of attempted murder of Antonio Webster (Antonio), and one count of aggravated battery with a firearm of Nikel. The State proceeded only on the counts concerning Nikel. The attempted murder counts alleged that defendant, without lawful justification and with intent to kill, shot Nikel while armed with a firearm (count I) that he personally discharged during the offense (count II) proximately causing great bodily harm (count III) (720 ILCS 5/8-4(a), 720 ILCS 5/9-1(a)(1) (West 2020)). The aggravated battery count (count IV) alleged that, in committing a battery, he knowingly shot Nikel about the body and caused an injury (720 ILCS 5/12-3.05(e)(1) (West 2020)).

¶ 4    Prior to trial, defendant filed a notice of intent to introduce evidence in support of self-defense pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984). In the motion, defendant outlined evidence of prior encounters with Nikel and Antonio. The court granted the motion.

¶ 5    At trial, Nikel testified that he was 27 years old. In December of 2021, he lived with his mother, Wanda Beason, his older brother Antonio, and defendant, who was Beason's boyfriend of about seven or eight years. At the time, Nikel had a good relationship with Beason and a "respectful" relationship with defendant. Nikel stated that Beason passed away on January 12, 2022.

¶ 6    On December 26, 2021, Nikel was at home with his family, including his niece, nephew, Antonio, Beason, and defendant. While in the living room with his niece and nephew, Nikel heard Beason and defendant arguing in their bedroom upstairs. A little while later, he entered the bedroom and stood by the dresser near the door, which closed behind him after he entered. Beason sat on the bed with her back to the headboard, and defendant sat at the opposite corner of the bed

and further away from Nikel. Nikel was speaking with his mother when "out of nowhere" defendant jumped up, turned towards Nikel, said "what's up now, motherf***," and started shooting at him from about five feet away. Defendant shot him in the right shoulder and side. Nikel did not see the firearm when he entered the bedroom or spoke to his mother. Nikel opened the door as fast as he could and then slipped and fell. He crawled out of the bedroom and yelled for Antonio, who was sleeping in another room upstairs.

¶ 7    As Nikel went down the stairs, he grabbed the railing and broke it. He lost his footing at the bottom of the stairs, slipped, and broke his arm. Antonio was behind him on the stairs, and they went to the living room where his niece and nephew were located. Nikel owned a firearm, which he stored in the front pocket of a suitcase in the living room. Nikel asked Antonio to retrieve the firearm to protect them, because Nikel could not use the firearm at that moment. Antonio retrieved the firearm and went to the front door. Nikel took his niece and nephew into the backyard. Defendant had already gone outside through the front door.

¶ 8    Nikel heard gunshots coming from the porch area at the front of the building and called 911. He and Beason went to the parking lot where they met police officers. Nikel did not see defendant in the parking lot or around the housing complex. Nikel went to the hospital for treatment of his wounds. He spoke to Chicago police detective Kevin Hawkins at the hospital.

¶ 9    The State published to the jury clips from the body-worn cameras of the police officers who responded to the shooting. The videos show the officers arriving in the parking lot of the housing complex, where they met Nikel and Beason, and a walkthrough of the home. The State also showed Nikel photographs of the home taken the evening of the shootings and depicting the bedroom where the shooting occurred.

¶ 10    On cross-examination, Nikel confirmed that the first time he relayed what happened was to Hawkins at the hospital. Nikel denied that he told Hawkins that he had been arguing with Beason over defendant staying at the house. He confirmed that after he heard the gunshots, he went to the front and told Antonio not to chase and shoot defendant.

¶ 11    Chicago police officer Joel Venegas testified that on December 26, 2021, he and his partner, Officer Brian Bodnar, responded to a call of a shooting nearby. They arrived at the parking lot of the residential complex and encountered Nikel and Beason. Nikel told Venegas that defendant shot him and that it occurred in the upstairs bedroom of the home. The State published Venegas' body-worn camera footage which depicted the events to which he testified.

¶ 12    Detective Hawkins testified that Nikel told him at the scene that defendant shot him. Beason told him that defendant shot her son. Hawkins identified photographs from the interior of the house after the shooting, including photographs of bullet holes in a wall and shower tile.

¶ 13    Hawkins went to the hospital where Nikel told him that he and his mother, Beason, had been arguing about defendant staying in the home, which was a common argument.

¶ 14    On cross-examination, Hawkins confirmed that Nikel told him that he was arguing with his mother prior to the shooting. He also confirmed that the only forensic evidence recovered was a .9-millimeter shell casing outside the home.

¶ 15    The State stipulated, without objection, that if called to testify, John Strode, a supervisor at the Firearms Services Bureau, would confirm that Nikel held a valid Firearm Owner Identification card on December 26, 2021.

¶ 16    Defendant testified that he had a "very rocky" relationship with Nikel and Antonio the month or so leading to the shooting. Defendant disapproved of them "putting their hands" on

Beason, which led to several physical and many verbal altercations. Over the State's objections, defendant recounted two incidents prior to the shooting involving Antonio and Nikel.

¶ 17    The first incident occurred about six weeks before the shooting, where Antonio and Beason had a "real vicious argument" over money. The argument began in the home, but then defendant and Beason went to her vehicle. Antonio stood outside the vehicle and heard defendant tell Beason to stop giving Antonio money. Antonio started beating on the vehicle's window with his fist and told defendant to "stay out of his business or [defendant] going to come up a dead man." Defendant felt that his life was threatened.

¶ 18    The second incident occurred about two weeks prior to the shooting. Beason was sick, and defendant called her employer at her request to call off sick. Nikel and Antonio "busted" into the bedroom and told him that he was "no good" and should be helping Beason, not calling off work for her so she could just lay around. Nikel had a firearm, and Antonio "took a couple of swings" at defendant as defendant ran out of the bedroom. Defendant felt "very, very threatened" and feared for his life.

¶ 19    Defendant testified that, prior to these two incidents, Nikel's firearm was the only one in the home. Following the incidents, Beason's friend dropped off a firearm for Beason at the home. Defendant took the firearm from Beason fearing she would injure herself and placed it on a shelf in her bedroom closet.

¶ 20    On the evening of the shooting, defendant was upstairs in the bedroom he shared with Beason. Nikel argued with Beason downstairs, and she then went upstairs to the bedroom. Defendant was not involved in the argument, but he heard Nikel yell upstairs to Beason that Nikel

did not need to take any of "this goofy s-h-i from her" and was only there to "keep [defendant] from jumping on her." Defendant denied that he and Beason ever had a physical altercation.

¶ 21    Defendant then heard a closet door open and close and the aluminum baseball bat kept in a closet near the kitchen clanging against the wooden stair rail as Nikel came upstairs. Defendant felt he was about to get beaten or maybe killed with the bat. Defendant went to the bedroom closet where the firearm was stored, as he "knew for a fact" that Nikel had the bat. He also knew Nikel kept a firearm in proximity to him.

¶ 22    Nikel entered the bedroom, pushed Beason out of the way, and swung at defendant with the bat but hit the door. When Nikel was "drawing back again," defendant thought Nikel was "getting ready to do something" to defendant and he had to try to stop him. Defendant discharged his firearm twice and shot Nikel. Defendant testified that he was not trying to kill Nikel, but trying to stop Nikel from "quite possibly killing" him.

¶ 23    Nikel left the bedroom. Beason was "hollering" and told defendant to leave because the police would arrive. Defendant left the apartment with the firearm, which he returned to the son of the man who had given it to him. As defendant left the complex, he encountered Antonio.

¶ 24    Defendant went to the police station on January 18, 2022, to turn himself in, but an officer told him the police were not looking for him. He was arrested a few days later.

¶ 25    On cross-examination, defendant confirmed that he did not call the police after either of the two prior altercations with Nikel and Antonio.

¶ 26    The State called Nikel in rebuttal. Nikel denied that he or Antonio ever put their hands on Beason. He confirmed that a wooden baseball bat was in a downstairs closet. Nikel denied ever threatening defendant with a firearm because defendant had called off work for Beason. He denied

having the bat or anything in his hands when he entered the bedroom on the day of the shooting. On cross-examination, Nikel confirmed that he had to pass the closet where the baseball bat was stored to get to the upstairs bedroom.

¶ 27    The State recalled Hawkins, who confirmed that he did not see any damage to the bedroom doorway following the shooting. On cross-examination, he confirmed that he was not looking for a baseball bat.

¶ 28    The trial court instructed the jury on the elements of attempted murder, aggravated battery with a firearm, and self-defense. The jury found defendant guilty of aggravated battery with a firearm and not guilty of attempted murder. The trial court denied defendant's posttrial motion and sentenced him to nine years in prison.

¶ 29    On appeal, defendant argues his conviction for aggravated battery with a firearm should be reversed where the State failed to prove beyond a reasonable doubt that he did not act in self-defense when he shot Nikel.

¶ 30    In considering a challenge to the sufficiency of the evidence, this court examines " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact's role is "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). It is not our function to retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. We will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or credibility of the witnesses.

*Id.* A conviction will not be overturned "unless the evidence is so unreasonable, improbable, or unsatisfactory" that reasonable doubt exists as to the defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 31    "The testimony of a single witness is sufficient to convict if the testimony is positive and credible." *Gray*, 2017 IL 120958, ¶ 36. "[I]t is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). A witness's testimony may be found insufficient to convict "only where the evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *People v. Corral*, 2019 IL App (1st) 171501, ¶ 72. A conviction will not be reversed simply because the evidence is contradictory or the defendant claims the witness was not credible. *People v. Bonaparte*, 2014 IL App (1st) 112209, ¶ 41.

¶ 32    To prove aggravated battery with a firearm, the State was required to establish that defendant knowingly discharged a firearm and caused injury to Nikel during the commission of a battery. 720 ILCS 5/12-3.05(e)(1) (West 2020). A defendant commits a battery if he knowingly, without legal justification, causes bodily harm to an individual by any means. 720 ILCS 5/12-3(a) (West 2020). Defendant does not contest that he shot and injured Nikel. Rather, he contends, as he did at trial, that he did so in self-defense.

¶ 33    Once a defendant raises self-defense, the State bears the burden of proving, in addition to the elements of the charged offense, that the defendant's actions were not justified beyond a reasonable doubt. *People v. Mujkovic*, 2022 IL App (1st) 200717, ¶ 26. The elements of self-defense are: (1) unlawful force was threatened against a person; (2) the person threatened was not the aggressor; (3) the danger of harm was imminent; (4) the use of force was necessary; (5) the

person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable. *People v. Boston*, 2018 IL App (1st) 140369, ¶ 95. If the State negates any of these six elements, the defendant's self-defense claim fails. *Id.*

¶ 34     Self-defense raises a question of fact for the trier of fact to determine. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 33. The trier of fact is not required to believe the defendant's version of events and may consider other factors and circumstances, including the relevant testimony of other witnesses, which may contradict his story or raise serious questions about its probability. *People v. Young*, 347 Ill. App. 3d 909, 920 (2004).

¶ 35     After reviewing the evidence in a light most favorable to the State, we find that a rational trier of fact could determine that the State disproved that that defendant acted in self-defense. The trial came down to a credibility contest between the State's witnesses and defendant.

¶ 36     Nikel testified that he went upstairs to the bedroom to speak with Beason after hearing arguing between Beason and defendant coming from the bedroom. While Nikel was speaking with Beason, defendant suddenly stood up and shot him "out of nowhere." Nikel denied that he had a baseball bat or anything in his hands when he entered the bedroom.

¶ 37     On the other hand, defendant testified Nikel previously threatened him with a firearm, and they had a contentious relationship. As Nikel came up the stairs to the bedroom, defendant heard the sound of an aluminum bat clanging against the wooden stair railing. Fearing a potentially deadly beating with the bat, defendant retrieved Beason's firearm from the bedroom closet. Nikel attempted to hit defendant with a bat and was "drawing back again" with the bat when defendant shot him twice, fearing for his life. Defendant did not remain on scene to present his self-defense

claim to authorities and ultimately returned the firearm to the son of the friend who had given it to him.

¶ 38    Photographs of the bedroom and home do not show a baseball bat, and the doorway which Nikel allegedly hit when he swung at defendant does not show damage.

¶ 39    Hearing the vastly different versions of the shooting as recounted by Nikel and defendant, it was for the jury to decide the credibility of Nikel and defendant, to weigh their testimony, and to resolve the conflicts therein. *Williams*, 193 Ill. 2d at 338. The jury could reasonably reject defendant's testimony as self-serving and incredible. See *People v. Brazziel*, 406 Ill. App. 3d 412, 423 (2010) (the jury is responsible for resolving inconsistencies across the witnesses' testimony); *People v. Peterson*, 273 Ill. App. 3d 412, 424 (1995) ("when the only evidence of self-defense is the defendant's testimony, the trier of fact has discretion to accord that testimony less weight because of its self-serving character"). Nikel's testimony alone was sufficient to prove defendant did not act in self-defense (*Gray*, 2017 IL 120958, ¶ 36) where it demonstrated defendant was the aggressor who shot the unarmed Nikel as Nikel stood speaking with Beason.

¶ 40    Defendant maintains that Nikel's testimony was so incredible, improbable, and unsatisfactory that it raises serious doubt as to defendant's guilt. He contends Nikel's testimony was largely uncorroborated, fraught with contradiction, and incomplete in recounting the events. Defendant essentially is requesting this court to reassess credibility and reweigh the evidence in his favor, which we cannot do. *Gray*, 2017 IL 120958, ¶ 35. We will not reverse a conviction merely because a defendant asserts that a witness did not testify credibly and defendant's version of events was more plausible. *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 60.

¶ 41    Defendant argues that the police witnesses' failure to recall seeing a baseball bat at the scene or photograph one during the course of their investigation does not disprove his contention that Nikel threatened him with the bat. As he notes, the investigating officers were not looking for a baseball bat, they could have easily overlooked its presence or significance, and anyone in the house could have moved it out of view. However, while Nikel's testimony corroborated the location of the baseball bat in the home, there was no other evidence apart from defendant's own testimony that he was threatened with a baseball bat prior to the shooting. The jury was not required to search for any possible explanation consistent with innocence and raise it to the level of reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 60. The jury heard the evidence and, given its finding that defendant was guilty of aggravated discharge of a firearm, the jury necessarily rejected his claim that he shot Nikel in self-defense fearing a beating with a bat.

¶ 42    Having reviewed the record and drawing all reasonable inferences in a light most favorable to the State, we find that there is nothing unreasonable, improbable, or unsatisfactory so as to justify a reasonable doubt of the defendant's guilt of aggravated battery with a firearm.

¶ 43    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 44    Affirmed.