2023 IL App (1st) 211107-U

No. 1-21-1107

Order filed June 9, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 17243 |
| | ) | |
| RAFAEL ALMAZAN, | ) | Honorable |
| | ) | Patrick Coughlin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The evidence was sufficient to prove defendant guilty of aggravated criminal sexual abuse of a family member beyond a reasonable doubt.

¶ 2   Following a bench trial, Rafael Almazan was found guilty of seven counts of aggravated criminal sexual abuse of a family member and seven counts of aggravated criminal sexual abuse of a minor. The trial court merged the counts of aggravated criminal sexual abuse of a minor into the counts for aggravated criminal sexual abuse of a family member, and sentenced Almazan to

five years in prison on each count, to be served concurrently. On appeal, Almazan argues that the State failed to prove him guilty of aggravated criminal sexual abuse of a family member beyond a reasonable doubt because the witnesses' testimonies lacked credibility and were insufficient to convict him. We affirm.

¶ 3    Almazan was charged by indictment with 27 sex offenses. The State nol-prossed two counts and proceeded to trial on one count of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a) (West 2016)), 12 counts of aggravated criminal sexual abuse of a family member (720 ILCS 5/12-16(b) (West 2016)), and 12 counts of aggravated criminal sexual abuse of a victim under the age of 13 (720 ILCS 5/12-16(c)(1)(i) (West 2016)). The counts variously alleged that, during three periods spanning from January 15, 2006, through January 14, 2013, Almazan touched or fondled his daughter V.A.'s sex organ, breast, back, and thigh for purposes of sexual gratification or arousal when she was under 13 years old.

¶ 4    V.A., who was 16 years old at the time of trial, testified she was born on January 15, 2003, and is Almazan's biological daughter. V.A. has three siblings, her older sister Mary Ann Almazan, and her older brothers Rafael Almazan and Richard Almazan. We refer to V.A.'s siblings by their first names because they share the same surname. V.A. had last seen Almazan, who she identified in court, two years before trial. Prior to that, she had regular visitations with Almazan pursuant to a court order. The visitations ended in August of 2017 when V.A. "spoke out" about "multiple" things that happened. She testified that she went to the police after speaking out about what happened to her.

¶ 5    V.A. recounted an incident in 2006, when she was three or four years old, during a potluck dinner after services at the church she attended with her family. There were many people present,

including men, women, and children. V.A. stood with her mother, Veronica Torres, at the food table when Almazan called V.A. over to the table where he was sitting. V.A. went to the table and greeted the people with Almazan. Almazan smiled, picked V.A. up, placed her on his leg, and bounced her up and down on his leg.

¶ 6    Almazan at some point stopped bouncing V.A. and placed his hand toward her "vaginal area." V.A. was wearing a dress, white shoes, and underwear. Almazan placed his hand on V.A.'s vagina over her underwear and was "rubbing" her. After a few moments, he touched V.A.'s vagina with his palm. There was no clothing between his palm and her skin. He continued speaking normally while he was touching her, and the only thing covering his lap was the plastic tablecloth. Almazan stopped touching V.A. when her brother Richard came to get her because her mother wanted to speak with her. V.A. "wiggled" her way out and walked with her brother to her mother's table.

¶ 7    At the time of the potluck, Almazan and Torres were married, and V.A. lived with them and her three siblings. Almazan and Torres later separated, and Almazan moved out. V.A. continued to see him every week or two weeks, and the visits lasted from morning until evening when V.A. returned home. The visits were usually at Almazan's home, in Harvey, Illinois. Almazan touched her inappropriately during these visits.

¶ 8    V.A. described one particular visit to Almazan's home when she was around six or seven years old. V.A.'s brother accompanied her on the visit, which "started off normal." They had just finished eating, and V.A. was playing with their cat in the kitchen while her brother was in the bathroom. Almazan sat on the twin-sized bunk bed, which was "a bit far" from the bathroom and called her over to sit with him. V.A. did not go over at first, but she eventually went and sat on the

bed with Almazan to her right. He told V.A. how much he cared about her, and how she was a good daughter. Almazan placed his hand on her thigh, over her jeans, and continued speaking normally, also telling her how much he loved her as a daughter. Almazan then put his hand on V.A.'s vagina over her jeans and began rubbing the outside of her vagina. He stopped touching her and "removed his hands immediately" when her brother flushed the toilet.

¶ 9     After returning home that day, V.A. told her mother that Almazan touched her and signaled with her hand towards where he touched her, gesturing above her right thigh area. V.A. told her mother that day because she was "really confused" and "didn't feel normal," and was "really tired" of Almazan "doing these things." She continued to visit Almazan, who did not stop touching her.

¶ 10    Around 2012, V.A.'s mother went to visit V.A.'s sister in Texas. V.A.'s brother Rafael, who was 23-years old at the time, took care of her while their mother was in Texas. Almazan was to "lightly" check in and drop V.A. off at school in the mornings.

¶ 11    While V.A.'s mother was in Texas, Almazan stayed the night in the home, even though he was not supposed to. Almazan stayed in the bedroom with V.A., which she shared with her mother and had two beds. V.A. woke up in the middle of the night in the dark room, hearing noises and felt someone sit on the edge of her bed. She was lying on her side underneath the blankets, facing the direction where Almazan was sitting near her legs. She was wearing a shirt and underwear. V.A. heard Almazan's voice but could not "make any of it out." Almazan placed his hand on her back, over the blanket, and V.A. "just blanked out for a couple of moments." Almazan rubbed her back through the blanket at first, and then he lifted the blanket, and she felt his hand go under her shirt and touch her breast. There was no clothing between his hand and her skin. Almazan also touched her vagina under her underwear and was "almost rubbing" and "cupping" it. V.A. stared

at the wall and just remembered "passing out." [1] V.A. also testified to a fourth incident in 2012, which occurred on a road trip. Defendant was found guilty of one count of predatory criminal sexual assault, three counts of aggravated criminal sexual abuse of a family member, and three counts aggravated sexual abuse of a minor premised on that incident. However, as discussed *infra*, the trial court vacated those findings of guilt following a hearing on defendant's posttrial motion.

¶ 12    V.A. testified that these incidents were not the only times that Almazan had touched her inappropriately. She did not come forward sooner or file a police report sooner because she was afraid for her mother. Almazan always indicated that "something might happen" to her mother, and V.A. would then go live with him.

¶ 13    On cross-examination, V.A. testified that she was living with her mother and brother Richard, who was 22 or 23 years old, in Posen, Illinois. Aside from her mother, V.A. never told any adults in her life about the incidents with her father until recently and never wrote them down.

¶ 14    V.A. testified that the potlucks at her church were family events. On the day of the incident at the potluck there were around 40 to 50 people present, including children. Her brother Richard was her only sibling present that day.

¶ 15    Almazan sat at a rectangular table in the middle of the room. The table was covered with a white plastic tablecloth that hung down off the table a few inches. Two other people were sitting at the table with Almazan, one next to him and the other across from them. People were also at the tables near them. V.A. could not recall what Almazan wore and the color of her dress, but recalled her dress was knee length. Almazan bounced V.A. on his leg for more than a minute as he spoke to someone and held her sides with both his hands. Almazan did not say anything to V.A. when he touched her and did not make her look at him. V.A. did not jump off his lap or look at him. Nor

did she tell the adult sitting across from them what he was doing. Richard came to get her, and she did not mention anything to him, her mother, or any other adult or child. They were at the potluck for two to three hours.

¶ 16    V.A. believed her mother requested the divorce when she was about eight or nine years old. Visitation with Almazan continued after the divorce by court order, and V.A. never "publicly" objected to the visits. She told her mother that she did not want to go with Almazan when she was eight or nine years old, but nothing changed. Her mother never told the police, and V.A. never told her teachers or siblings about what was going on. She would visit Almazan with her brother, unless her brother was sick or unable to make it. Almazan reprimanded and yelled at V.A. but never hit her.

¶ 17    V.A. testified that she was around eight to nine years old when the incident at Almazan's home occurred. The house was divided into different living spaces, and there were other adults in the building. She wore blue jeans and a shirt that day. Before placing his hand on V.A.'s thigh, Almazan did not say anything sexual to her, only that he cared a lot about her and loved her as a daughter. He was rubbing her over her clothes, while repeatedly telling her he loved her a lot.  She did not recall how old her brother was at the time.

¶ 18    V.A. never told her brother what happened, but she told her mother after this visit, and her mother contacted the authorities. The only time V.A. recalled the police coming over was when she refused to go to a visitation with Almazan. She did not scream or yell that she did not want to go but was "forced to go with him," and the visitations continued.

¶ 19    V.A. was around eight or nine years old when her mother went to Texas to visit V.A.'s sister. Her brothers were home but she did not tell them what happened or ask for medical assistance. Almazan was not verbally abusive towards her at this time.

¶ 20    V.A. and her mother got along well, and her mother never punished her. V.A. was not afraid of her mother but was afraid of Almazan. She had also been afraid of him when she was younger. She lived with her mother and they discussed these events multiple times but did not know if her mother took notes. V.A. only reviewed the facts with the State's attorney prior to trial.

¶ 21    Torres, through an interpreter, testified that she and Almazan were married for 20 years and divorced in 2011, after about two and half to three years of separation. Almazan is the father of her four children.

¶ 22    While they were still married, the family attended church services. There were occasions where they attended potlucks after church services. Torres took her son Richard and V.A. to a potluck when V.A. was about three or four years old. About 15 adults and many children were in attendance at the potluck.

¶ 23    Almazan had visitation with V.A. from 8 a.m. to 8 p.m. at his house every other weekend. Pursuant to the visitation order, Almazan was not allowed to have V.A. overnight. V.A. and Richard always went on these visits together. Almazan picked them up and at times would drop them off. There were times when Almazan would tell V.A. that "something might happen" to Torres and that V.A. would have to live with him, and that Almazan told Torres, " 'Just do whatever you want.' " In August 2011, V.A. returned home from one of these visits and told Torres that Almazan had been touching her. V.A. gestured with her hand towards her vaginal area.

¶ 24     In 2012, Torres was in Texas with her other daughter, Mary Ann, due to an emergency. At that time, she left eight-year-old V.A. in the care of Rafael, V.A.'s brother who would have been maybe 22 years old. She had asked Almazan for permission to take V.A. with her to Texas as they had joint custody. Almazan "threatened that under no circumstances she was to go." Torres asked Almazan to drop V.A. off at school since Rafael could not drive at the time. Torres did not give Almazan permission to stay in her home while she was gone.

¶ 25     On cross-examination, Torres testified that she never told the police or filed a complaint regarding Almazan's threats to her. V.A. and Richard went on visitations together, except for the last two years when V.A. went by herself.

¶ 26     Torres testified that V.A. was about four years old when the potluck incident occurred, which was about 12 years ago. Almazan sat at a table talking to about three people, who were seated in front of him. The tables were covered with plastic tablecloths that hung over the edge about a foot. Torres saw V.A. with Almazan, who had called V.A. over. V.A. remained with him for about ten minutes. Torres was at another table approximately 30 to 35 feet away from them. When V.A. returned to her, she was "different." "It was like she wanted to say something to me, but then she didn't say anything."

¶ 27     Torres filed a report with the Department of Children and Family Services (DCFS) after V.A. told her what happened with Almazan in August of 2011, and an investigation started. She did not know she needed to call the police.

¶ 28     Torres immediately returned from Texas "when the children told [her] that [Almazan] had gone into the house." Almazan's visitation with V.A. continued from 2011 to 2017 and was court ordered. During that period of time, Torres received advice to contact the police, but it was "just

too much to bear" due to her heart condition. Torres did not call the police "because of the agony of *** somebody is living with such abuse *** you no longer know of how to direct yourself." She learned of the events when V.A. "cried out." Torres documented the information in a police report. Torres did not discuss the incidents with V.A. prior to trial because V.A. cried every time she spoke about it.

¶ 29    Torres got along well with V.A. and never spoke negatively about Almazan to V.A. Almazan scolded V.A., but Torres did not think he beat V.A.

¶ 30    On redirect examination, Torres testified that her divorce from Almazan was finalized in 2011. In 2017, V.A. told her everything that happened, and Torres filed a police report, which initiated this case.

¶ 31    The State entered the following stipulations: (1) Almazan's and V.A.'s dates of birth; (2) there were no DCFS records involving Almazan or V.A. from 2011; and (3) a police report was made in 2011 after the police were called to V.A.'s home.

¶ 32    The court found Almazan guilty on one count of predatory criminal sexual assault of a child, 10 counts of aggravated criminal sexual abuse of a family member, and 10 counts of aggravated criminal sexual abuse of a minor under the age of 13. Almazan was found not guilty on two counts of aggravated sexual abuse of a family member, and two counts of aggravated sexual abuse of a minor.

¶ 33    In announcing its findings of guilt, the trial court stated that V.A. had "a very good recollection of these incidents" and was "very detailed in her description of these events." It found her "very credible." The court acknowledged the defense's argument that V.A.'s testimony was perhaps rehearsed or coached, but noted there would be no reason for V.A. to make up allegations

that go back many years, span several different locations or times, and when others were nearby. It noted that V.A. had no other reason to want to end her visitation with Almazan. The court was "not troubled" by V.A.'s delayed outcry because she had immediately told her mother after the incident in 2011.

¶ 34    The court found watching V.A. recall these events was "very compelling testimony" and noted V.A. testified that she was still afraid of Almazan, which explained her failure to make immediate or additional outcries. The court also found that Torres's testimony "in some ways" corroborated V.A.'s testimony. It cited Torres's testimony about V.A.'s outcry in 2011 and Torres's return from Texas immediately upon learning that Almazan had been in the house, which made "perfect sense" if V.A. had told her about Almazan touching her as described in the 2011 outcry. The court also found that the State met its burden in proving that these acts were for Almazan's sexual gratification or arousal, citing the manner of the contact, Almazan's reactions when others approached, and his words to the victim as these incidents occurred.

¶ 35    Almazan obtained new counsel and filed a combined motion for reconsideration, motion for acquittal, and motion for new trial. The court granted the motion in part, vacating the findings of guilt on the predatory criminal sexual assault of a child count and six counts of aggravated criminal sexual abuse, agreeing with Almazan that the State did not prove jurisdiction over those counts as it did not prove the incidents occurred in Illinois. The court denied the motion as to the other 14 counts.

¶ 36    The trial court merged the seven remaining aggravated criminal sexual abuse of a minor counts (counts V, VII, IX, XI, XV, XVII, and XIX) into the seven aggravated criminal sexual

abuse of a family member counts (counts IV, VI, VIII, X, XIV, XVI, and XVIII) and sentenced Almazan to five years in prison on each of the latter counts, to be served concurrently.

¶ 37    On appeal, Almazan argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt of aggravated criminal sexual abuse of a family member because the witnesses' testimonies lacked credibility. He also contends that, in assessing credibility, the trial court failed to place weight on the context of this case, which involved "deep animosity" between V.A.'s parents and where V.A. was "within the orbit of her mother on a daily basis."

¶ 38    In considering a challenge to the sufficiency of the evidence, this court examines " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for weighing the evidence, assessing the credibility of witnesses, and resolving any inconsistencies in the testimony. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). It is not the reviewing court's function to retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. We will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or credibility of the witnesses. *Id.* A conviction will not be overturned "unless the evidence is so unreasonable, improbable or unsatisfactory" that there is reasonable doubt as to defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 39    "The testimony of a single witness is sufficient to convict if the testimony is positive and credible." *Gray*, 2017 IL 120958, ¶ 36. The trier of fact's credibility determination is entitled to great deference, but is not conclusive on appeal. *People v. Cunningham*, 212 Ill. 2d 274, 280

(2004). "A trier of fact is free to accept or reject 'as much or as little' of a witness's testimony as it likes." *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 46 (quoting *People v. Logan*, 352 Ill. App. 3d 73, 81 (2004)). "[I]t is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *Cunningham*, 212 Ill. 2d at 283. Minor inconsistencies in the testimony of a witness or between witnesses may affect the weight of the evidence, but do not automatically create reasonable doubt. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85. A witness's testimony may be found insufficient to convict "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Id.* A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims the witness was not credible. *People v. Bonaparte*, 2014 IL App (1st) 112209, ¶ 41.

¶ 40    As relevant here, a person commits aggravated criminal sexual abuse when he "commits an act of sexual conduct with a victim who is under 18 years of age and the person is a family member." 720 ILCS 5/12-16(b) (West 2016).[1] "Sexual conduct" means "any knowing touching or fondling by *** the accused either directly or through clothing, of the sex organs, anus, or breast of the victim *** or any part of the body of a child under 13 years of age *** for the purpose of sexual gratification or arousal." 720 ILCS 5/11-0.1 (West 2016). "A defendant's intent to arouse or gratify himself sexually can be inferred solely from the nature of the act." *People v. Burton*, 399 Ill. App. 3d 809, 813 (2010). Almazan does not dispute that he is V.A.'s father and that, during the relevant time periods, V.A. was under 13 years old. Rather, he challenges the sufficiency of

---

[1] Effective January 1, 2022, 720 ILCS 5/12-16 (West 2016) has been renumbered to 720 ILCS 5/11-1.60(b) (West 2022).

the evidence proving the "sexual conduct" element of the aggravated criminal sexual abuse convictions.

¶ 41   Almazan was convicted of the following charged conduct: in the period from January 15, 2006, through January 14, 2008, touching or fondling V.A.'s sex organ in two separate instances (counts IV and VI); in the period from January 15, 2011, through January 14, 2012, touching or fondling V.A.'s thigh and sex organ (counts IV and VI); and in the period from January 15, 2011, through January 14, 2013, touching or fondling V.A.'s back, breast, and sex organ (counts XIV, XVI, and XVIII).

¶ 42   Viewing the evidence in a light most favorable to the State, a rational trier of fact could find Almazan guilty beyond a reasonable doubt of all seven counts of aggravated criminal sexual abuse of a family member. V.A., who was born in 2003, testified to seven specific incidents where Almazan touched her vagina and other parts of her body, either directly or through her clothing.

¶ 43   The first two incidents took place at the potluck following church services when V.A. was three or four years old and Almazan first rubbed her vagina through her clothing and then directly rubbed it under her underwear while she sat on his leg. The third and fourth incidents took place at Almazan's home when V.A. was eight or nine years old and Almazan put his hand on her thigh and then rubbed her vagina through her clothing while they sat a bed and he expressed how much he loved and cared for her. The final three incidents took place in her home when V.A. was eight or nine years old and Almazan first rubbed her back, then put his hand under her shirt and rubbed her breast, and then touched her vagina under her underwear while she laid on her bed in the dark staring at the wall.

¶ 44    Based on V.A.'s testimony regarding the nature and the circumstances surrounding Almazan's touching of her, a rational trier of fact could reasonably infer that Almazan's touching of V.A. was for his own sexual gratification. V.A.'s testimony recounting the seven incidents, standing alone, is sufficient to prove that Almazan committed an act of sexual conduct against her in each instance. *People v. Wells*, 2019 IL App (1st) 163247, ¶ 23 ("[u]nequivocal testimony from a single complainant *** is sufficient to sustain a conviction in a sexual crimes case"). The trial court found V.A.'s testimony "very credible" and "compelling," noting her ability to recount the abuse and recall specific details from the incidents while admitting when she could not remember specific details. We defer to that credibility determination. *Siguenza-Brito*, 235 Ill. 2d at 224-25 (the trier of fact is responsible for weighing the evidence and credibility of witnesses).

¶ 45    Additionally, V.A.'s testimony was, in part, corroborated by her mother's testimony. Torres confirmed that the family attended potluck dinners at the church and testified that, when V.A. was about four years old, she seemed different when she returned from Almazan's table during a potluck. Torres corroborated V.A.'s testimony that she reported the 2011 incidents that occurred at Almazan's home to Torres when V.A. returned home that day, and that V.A. motioned to demonstrate that Almazan had touched her vaginal area. Torres also confirmed that she immediately returned home from Texas in 2012 upon learning that Almazan had been in her house. Both Torres and V.A. testified to being subjected to threats by Almazan. The totality of the evidence, when viewed in a light most favorable to the State, was sufficient for a rational trier of fact to find that Almazan was guilty of all seven counts of aggravated criminal sexual abuse of a family member beyond a reasonable doubt.

¶ 46    Nevertheless, Almazan claims that the evidence was insufficient to convict him because V.A. and Torres's testimonies lacked credibility and the trial court placed insufficient weight on the context of the case in assessing credibility. Almazan argues that Torres influenced V.A.'s testimony, pointing to the evidence that V.A. lived with Torres at the time of the incidents and certain incidents stemmed from the same period of time as her parents' divorce in 2011, which had created animosity between the parents. Almazan also argues that V.A. lacked credibility because she delayed making an outcry of sexual abuse against him, and certain incidents testified to, particularly the potluck, had occurred 12 to 13 years prior to trial. Almazan further argues that Torres's testimony lacked credibility given her animosity toward him following their divorce, her failure to contact police in response to V.A.'s outcry that Almazan inappropriately touched her in his home, and her ability to recall specific details relating to the long-ago potluck incident, which Almazan asserts is "incredible and unfathomable."

¶ 47    Here, the trial court heard and rejected many of these arguments, including Almazan's theory that V.A. may have been coached and her testimony influenced by Torres. The court found there would be no reason for V.A. to make up allegations that spanned years and occurred at different locations or want to end her visitation with Almazan other than these incidents. *Cunningham*, 212 Ill. 2d at 284-85 ("a reviewing court should bear in mind that the fact finder had the benefit of watching the witness' demeanor"). The court noted that even after V.A. made an outcry to Torres after the 2011 incident at Almazan's home, Torres did nothing to stop the situation and V.A.'s visitation with Almazan continued, which the court found dispelled the notion that Torres prompted V.A.'s outcry of sexual abuse. The court further found Torres's failure to do

- 15 -

anything after V.A. made her outcry in 2011 explained why V.A. did not make additional outcries as nothing had changed when she did so, and she was afraid for her mother given Almazan's threat.

¶ 48      The trial court, as trier of fact, was in a superior position to assess and weigh the credibility of witnesses, observe their demeanor, and resolve conflicts in their testimony. *People v. Richardson*, 234 Ill. 2d 233, 251 (2009). We decline Almazan's request for this court to reweigh the evidence as a basis to reassess V.A.'s and Torres's credibility, which we cannot do. *Gray*, 2017 IL 120958, ¶ 35 (this court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or credibility of the witnesses). Nothing in the record on appeal convinces this court that the trial court's credibility findings were unreasonable, improbable or unsatisfactory.

¶ 49      Imposing a time limit on a victim's outcry would place an unnecessary burden on the victim and trivialize the defendant's actions. *People v. Denis*, 2018 IL App (1st) 151892, ¶ 46. Further, a "delay in reporting incidents of sexual abuse may be reasonable where the victim's silence can be attributable to fear of the offender or to shame, guilt, and embarrassment" (*People v. Duplessis*, 248 Ill. App. 3d 195, 199 (1993)), and, as the trial court noted, the evidence here shows V.A. was afraid of Almazan for both herself and Torres.

¶ 50      As Almazan points out, there is no physical evidence of these incidents. But V.A.'s unequivocal testimony, "even absent corroborating physical evidence, is sufficient to sustain a conviction in a sexual crimes case." *Wells*, 2019 IL App (1st) 163247, ¶ 23. We will not reverse a conviction "simply because the defendant tells us that a witness is not credible," as that determination is the province of the finder of fact, and "we shall not invade it." *People v. Byron*, 164 Ill. 2d 279, 299 (1995). Here, the evidence of Almazan's aggravated criminal sexual abuse of

V.A. is not so unreasonable, improbable or unsatisfactory that there is reasonable doubt as to his guilt. See *Wright*, 2017 IL 119561, ¶ 70.

¶ 51    For the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 52    Affirmed.