2025 IL App (1st) 240132-U

No. 1-24-0132

Order filed August 13, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 19 CR 16983 |
| HARVEY PITTS, | ) ) | Honorable Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for first degree murder is affirmed over his contention that the eyewitness identification of defendant as the shooter was unreliable and uncorroborated.

¶ 2    Following a bench trial, defendant Harvey Pitts (Defendant) was found guilty of first degree murder and sentenced to 38 years in prison. On appeal, defendant argues that the evidence was insufficient, because the eyewitness identification was unreliable and uncorroborated. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4    Defendant was charged by indictment with six counts of the first degree murder of Jontaye Walker (Walker). Relevant here, count III charged that defendant, without lawful authority, intentionally and knowingly killed Walker while armed with a firearm and, during commission of the offense, personally discharged a firearm. 720 ILCS 5/9-1(a) (1) (West 2014).

¶ 5    At trial, Desyre Williams (Williams) testified that she was Walker's girlfriend, and he was a member of the Pooh Bear Gang. On November 26, 2015, Thanksgiving Day, Williams and Walker were at his mother's apartment. Around 1 p.m., they were outside arguing by her vehicle, which was parked in the middle of the block on Thome Street. Williams was standing in the street to the side of her vehicle, while Walker was at the front of the vehicle removing the license plate at her request. A green van then drove past slowly and stopped at a stop sign at the end of the street, about three to four vehicles away. "Harvey," whom she identified in court as defendant, exited the passenger side of the van holding a firearm, moved towards them, and started shooting towards Walker. Defendant wore pants and a dark hoodie with the hood up, but she could still "see his whole face." Nothing blocked her view of defendant. Williams did not know defendant well, but she had "seen his face around" at Sullivan High School, from which she graduated in 2012, and around the Rogers Park neighborhood where she lived, by "Howard [Street] basically."

¶ 6    After defendant started shooting, Walker ran in the opposite direction towards his mother's home, and defendant chased after him. Williams was also "running along the path." Defendant "kind of got close" to her when he was shooting at Walker and made eye contact with her for "like a second." Williams said, "please stop, this is not that serious." Defendant paused "a little bit"

before chasing Walker again. Walker fell by the stop sign near his mother's home. Defendant stood right over him, shooting, and "[b]asically just finished him off." Williams was about an arm's reach from them and heard at least five gunshots. When defendant ran back to the same van he had exited, Williams ran to Walker and called the police.

¶ 7    As soon as the police arrived a few minutes later, Williams told them that she saw the shooter's face, knew the person who did it, and named "Harvey" as the shooter. They showed her a photograph, and Williams identified it as an old picture showing a younger version of defendant. The police then showed her an updated photograph of defendant. She told the police that she knew defendant from Howard [Street].

¶ 8    The State published two surveillance videos, which were admitted into evidence without objection. As the videos were shown in court, Williams described the incident. Williams testified that the videos depicted the van she observed drive slowly down the street and stop at a stop sign at the other end of the block. Defendant ran towards Walker and Williams. After Walker fell on the grass near the corner, defendant stood right over Walker shooting him. Williams confirmed that the video depicted that she was about an arm's length away from defendant. Defendant then ran in the opposite direction towards the same van. The video clips are included in the record on appeal and are consistent with Williams' testimony describing the shooting, including her proximity to defendant during the incident.

¶ 9    During her electronically recorded interview (ERI), Williams identified a photograph of "Harvey" as the shooter. After her ERI, Williams testified before a grand jury and identified "Harvey" as the shooter in a photograph.

¶ 10    On cross-examination, Williams confirmed that she had been arguing with Walker and on her phone when the van pulled up. She noticed the van because it sat there for a second and someone jumped out; a person does not normally exit a vehicle at a stop sign. The shooter's hoodie was up but not to the point that his face could not be seen. Williams demonstrated that the circular area above the eyebrows and around the nose, chin, and mouth were visible. She saw the shooter's face as he ran towards them and when the first shot was fired.

¶ 11    As the shooter ran after Walker, he and Williams were "kind of side by side" running in the same direction. The only time she could not see the shooter's face was for the few seconds he ran towards the grass where Walker fell. Williams observed the shooter, who was "by" her, for about two to three seconds as he stood over Walker before running back towards the van. She did not know Leroy Francis (Leroy) and never viewed his photo. She confirmed that she knew defendant from high school. On redirect examination, Williams confirmed that she had seen defendant randomly around the neighborhood since high school in 2008. The day of the shooting was the first time that she saw defendant in 2015.

¶ 12    Lamont Livingston (Livingston) testified that on November 26, 2015, he was in his third-floor apartment on the 2200 block of Thome Avenue in Chicago. At around 1:15 p.m., he heard gunshots outside and ran to the front living room window. From about 60 to 75 feet away, he saw a man dressed in a dark hoodie and dark pants chasing and shooting another man. It was sunny outside. Large trees were in front of Livingston's house but his view of the individuals as they moved down the street was not blocked. When the individuals reached the corner of Thome and Bell Avenue, the second man collapsed on the lawn, the shooter stood over him, and Livingston heard more gunshots. A woman on the lawn within three feet from them was screaming and trying

to intervene. Livingston then observed the shooter flee east on Thome and enter a dark colored van. Livingston heard about 12 gunshots in total.

¶ 13    On November 28, 2015, Livingston went to the police station where he identified defendant as the shooter in a photo array. Livingston never saw the shooter's face. He made his identification "[b]ased on the description that the detectives suggested" and the "height, complexion, [and] size." From the six photographs viewed, he selected the individual who matched what he saw on November 26, 2015.

¶ 14    On cross-examination, Livingston confirmed that he did not see the shooter's face. He identified the individual based on what he saw and the description police gave him. It was a "possibility" that had there been another individual in the photo array that had a similar complexion, height, and weight, he would have identified that person as the shooter.

¶ 15    Maria Caref (Caref) testified that around 1:15 p.m. on November 26, 2015, she was napping inside her third-floor apartment on the 2200 block of Thome when she heard gunshots, screaming, and very loud crying outside. She went to her front living room window and observed the back of two men running next to each other in the grassy area in front of her building. One of the men, with "[t]an color or maybe light African-American" skin, was holding something. Caref heard maybe six gunshots. On November 28, 2015, she went to the police station where she viewed a photo array. She did not identify defendant as the shooter.

¶ 16    On cross-examination, Caref denied that the police tried to influence her to identify someone in the photo array. When she told the police that she did not see the shooter's face, they told her to do her best with the photo array.

¶ 17    Cornelius Jones (Jones) testified that he had been incarcerated on unrelated charges since at least 2016. He testified pursuant to cooperation and plea agreements in which he agreed to cooperate fully with this case in exchange for his plea and sentence.

¶ 18    On November 26, 2015, Jones was a member of the Loc City faction of the Gangster Disciples gang. At that time, there was an ongoing dispute between the Loc City and Get Rich factions of the Gangster Disciples and the Pooh Bear Gang. He knew defendant, whom he identified in court, "[j]ust from passing by." Defendant was from the same area, but a different crowd. Jones was "not going to tell" what gang defendant was in. He knew Leroy just as "somebody that be around." Jones had heard of Velon Francis (Velon) (also spelled Vallon, Valon, and Vallan), but did not "know him like that." He did not know "Amanda" and Adrianna Prince. Jones never had a conversation with or saw defendant, Leroy, or Amanda the day before or in the days following Thanksgiving of 2015.

¶ 19    On December 21, 2016, Jones spoke with police detective Jose Cardo and Assistant State's Attorney Bridgit O'Brien and gave a video recorded interview. Jones did not recall the conversation or what occurred at that time, testifying he was high during the interview.

¶ 20    Jones confirmed that on May 25, 2017, he testified before the grand jury in this case. His grand jury testimony was admitted as substantive evidence as it was a sworn statement made under oath.

¶ 21    At the grand jury hearing, Jones testified that he had rank in his Loc City gang as an "overseer," assisting gang members who needed advice, money, weapons, or to leave town. He knew defendant and Leroy, both members of the Loc City faction of the Gangster Disciples. The Get Rich faction of the Gangster Disciples was a branch under the Loc City. Defendant's role in

the gang was to "get it done." Defendant was known as "the Death Angel" because "every time we send him out, somebody end up dead." Brothers Leroy and Velon were "hustlers," selling drugs for the gang. Defendant and Leroy had been sent to Texas "because [defendant] was on the run." In November 2015, while they were in Texas, Velon was killed. Defendant and Leroy returned to Chicago a day or two after Velon's death. Defendant was angry about Velon's death and wanted "to get back at people" for the shooting.

¶ 22    When Jones was home the day before Thanksgiving in 2015, at around 1 or 2 p.m., he received a call from defendant's girlfriend, Amanda, asking for "weed." Jones went downstairs and met her in a dark-colored either blue or green van. Defendant and Leroy were also in the van, and Jones observed a pair of firearms on the floor by their feet. They told Jones that they had been "riding all night" to find someone on whom to exact revenge for Velon's death.

¶ 23    The next day, Jones received a text from defendant stating that he caught and killed a member of the Pooh Bear Gang, who were believed to be responsible for Velon's death. Several days after Thanksgiving, defendant told Jones that defendant "f*** up," because the man he killed was "with a female and [defendant] should have killed her a** too." Defendant believed that the woman had seen his face and knew him. Defendant told Jones that he and Leroy argued over who should shoot Walker. Defendant took the firearm, ran out, and shot Walker. He then stood over Walker and shot him four more times.

¶ 24    On cross-examination, Jones identified his handwritten affidavit dated April 28, 2022, which is included in the record, averring that what he told the assistant state's attorney and the grand jury about defendant was not true, and that he never spoke with defendant after the shooting.

He made some of the statements believing that defendant had testified against him, but he later learned that was not true.

¶ 25    On redirect examination, Jones testified that he got all the facts stated in his recorded interview and grand jury testimony by piecing together what the officers told him when they spoke to him. He made up the statement about defendant visiting him two days after Thanksgiving and about defendant being in a gang.

¶ 26    Chicago police officer (now sergeant) Christoph Wertepny (Wertepny) testified that around 1:20 p.m. on November 26, 2015, he and his partner, Officer Kovacs, responded to a person shot call near 2200 West Thome Avenue. At the scene, Wertepny spoke with Williams, who was "[v]ery upset, very frantic." She stated that the victim was shot and "it was Harvey, Harvey from Howard." The officers pulled up a computer photograph of defendant, from when he was around 12 years old, and Williams confirmed that he was the shooter. Williams stated that she went to school with defendant, and they used to "hang out" on Howard Street. Wertepny had prior contact with "Harvey from Howard," and identified defendant in court as "Harvey."

¶ 27    On cross-examination, Wertepny confirmed that Williams had only given him a first name, "Harvey from Howard." He was familiar with "Harvey from Howard" and knew it was defendant. Wertepny was also familiar with Leroy but did not show Williams a photograph of him. Defendant's name was "pretty good information" they had to go on.

¶ 28    The parties stipulated that Dr. Eimad Zakariya, an assistant medical examiner in the Cook County Medical Examiner's office, would testify that Walker's body had 17 gunshot wounds, his cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶ 29    Shanta Pitts (Shanta) and Gwendolyn Meyers (Meyers), defendant's sister and mother, respectively, testified for the defense. Both testified that on November 26, 2015, between 1 and 1:30 p.m., they were home having Thanksgiving dinner with defendant. Shanta further testified that the only time defendant left the home was to go to the store with her later that evening at around 5:30 or 6 p.m. for about 10 or 15 minutes. She denied previously telling detectives that defendant went to Texas after Thanksgiving and thought he was at Leroy's mother's house.

¶ 30    Meyers testified that defendant was with her in her home the entire Thanksgiving Day. She knew Leroy, who had a similar weight and height to defendant in November 2015. People had commented to her that Leroy and defendant looked similar, and they thought that Leroy was her son. On cross-examination, Meyers testified that in December of 2015, defendant went to his stepfather's home in Indiana to learn how to fix vehicles. She did not recall telling detectives that she sent defendant out of town because he was hanging out with the wrong people. Defendant and Leroy were "associates," but she was not aware that either was in a gang.

¶ 31    The parties stipulated that Caref identified a different man as the shooter in the photo array that she viewed.

¶ 32    In rebuttal, the State called Chicago police officer Jose Cardo, who testified that during his investigation of Walker's death, Meyers told him that she had sent defendant out of town because he was hanging out with the wrong people. Shanta told him that defendant had gone to Texas, and she believed he was at Leroy's mother's house.

¶ 33    At closing, defense counsel argued that defendant had an alibi, and that this was a case of mistaken identity. Counsel pointed to photos of defendant and Leroy and noted that the two had often been mistaken for one another because they were so physically similar. Counsel argued

Leroy had the strongest motive for the revenge shooting, as it was his brother who had been shot a few days earlier.

¶ 34    The court found defendant guilty on all counts. The court explained that it did not rely on the testimonies of Livingston and Caref for the identification of defendant as the shooter, because they were too far away to observe the shooter's face and their identifications were based on the descriptions received from police. It did rely on their testimonies in finding that a shooting took place. The court stated it placed no weight whatsoever on Jones testimony. Jones "basically recanted," and the court did "not feel that he's been consistent enough to be reliable to support a conviction."

¶ 35    The court found Williams "a very credible witness," stating she gave a detailed account of the events before, during, and after the shooting. The court noted Williams' testimony that she identified defendant because she knew him from high school and Howard Street, and she got a good look at him even though he was wearing a hoodie. The court found that the surveillance video corroborated Williams' testimony regarding defendant's actions from when he exited the van and throughout the shooting, and showed that she was "right next to [defendant] when he fired the final shots into Mr. Walker's body." The court concluded that its "findings of guilt are based on her testimony alone, and to a limited extent, [Livingston's] and [Caref's] testimony, but not their identification of [defendant] as the shooter."

¶ 36    Defendant filed a motion to enter a judgment of acquittal or alternatively grant a new trial. Defendant argued, *inter alia*, that the evidentiary facts did not exclude every reasonable hypothesis consistent with defendant's innocence, namely his alibi affirmative defense that the shooter was

actually Leroy, who not only looked like defendant, but was also often mistaken as being his brother. The court denied defendant's posttrial motion.

¶ 37 The court merged five counts into remaining first degree murder count III and sentenced defendant to 38 years in prison. The trial court denied defendant's motion to reconsider his sentence.

¶ 38                                   II. ANALYSIS

¶ 39 On appeal, defendant argues that Williams' identification of defendant as the shooter was unreliable and that the remaining evidence presented by the State did not sufficiently corroborate her doubtful identification.

¶ 40 In considering a challenge to the sufficiency of the evidence, this court examines " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "That standard applies whether the evidence is direct or circumstantial and does not allow this court to substitute its judgment for that of the trier of fact on issues that involve the credibility of the witnesses and the weight of the evidence." *People v. Jones*, 2019 IL App (1st) 170478, ¶ 25.

¶ 41 A conviction will not be overturned "unless the evidence is so unreasonable, improbable or unsatisfactory" that there is reasonable doubt as to defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70. We will not reverse a conviction just because the evidence is contradictory or because the defendant claims the witness was not credible. *People v. Bonaparte*, 2014 IL App (1st) 112209, ¶ 41. Rather, "[t]he positive, credible testimony of a single witness, even if contradicted

by the defendant, is sufficient to convict a defendant." *People v. Sauls*, 2022 IL 127732, ¶ 52. An eyewitness' testimony is insufficient "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 42    To prove first degree murder as charged in count III, the State must show that the defendant killed an individual without lawful justification and, in performing those acts, either intended to kill or do great bodily harm to the victim or another, or knew that such acts would cause death. See 720 ILCS 5/9-1(a)(1) (West 2016).[1] Defendant only challenges his identification as the shooter who killed Walker.

¶ 43    Here, Williams identified defendant as the shooter, and the trial court found she was "a very credible witness." It explicitly noted that she was detailed in her account of the shooting, and that the surveillance video corroborated her testimony. Williams' testimony was consistent in recounting the shooting, and she identified defendant as the shooter by name and in photographs on multiple occasions. We defer to the trial court's credibility findings. Williams' credible testimony alone was sufficient evidence to convict defendant of first degree murder. *Sauls*, 2022 IL 127732, ¶ 52.

¶ 44    Nevertheless, defendant argues that the State failed to meet its burden of proof because Williams' identification was unreliable. Defendant contends that the brief duration of the incident,

---

[1] Count III also charged, for purposes of sentencing enhancements, that defendant committed the offense while armed with a firearm and, during that commission, personally discharged the firearm. See 730 ILCS 5/5-8-1(a)(1)(d)(i)-(ii) (West 2016) (if, during commission of first degree murder, the offender (i) was armed with a firearm, 15 years shall be added to the sentence or (ii) personally discharged a firearm, 20 years shall be added to the sentence).

along with Williams' prior passing acquaintance with defendant and her unfamiliarity with Leroy, who had a similar appearance to defendant, led to an acquaintance misidentification, *i.e.*, there is a strong possibility that Williams mistook defendant for the similar-appearing Leroy.

¶ 45    The State bears "the burden of proving beyond a reasonable doubt the identity of the person who committed the crime." *People v. Slim*, 127 Ill. 2d 302, 307 (1989). A single witness' identification of the defendant is sufficient for a finding of guilt where the defendant is viewed under conditions permitting a positive identification. *People v. Booker*, 2015 IL App (1st) 131872, ¶ 70. That proposition "is true even in the presence of contradicting alibi testimony, provided that the witness had an adequate opportunity to view the accused and that the in-court identification is positive and credible." *Slim*, 127 Ill. 2d at 307.

¶ 46    Illinois courts adopt the factors set forth in *Neil v. Biggers*, 409 US 188 (1972), to assess the reliability of witness identifications. *Slim*, 127 Ill. 2d at 307. The *Biggers* factors include (1) the witness' opportunity to view the defendant during the offense; (2) the witness' degree of attention at the time of the offense; (3) the accuracy of the witness' prior description of the defendant; (4) the witness' level of certainty at the subsequent identification; and (5) the length of time between the offense and the identification. *Id.* at 308. Our supreme court also considers the witness' prior acquaintance with the offender as a relevant factor. *People v. McTush*, 81 Ill. 2d 513, 521 (1980). "None of these factors, standing alone, conclusively establishes the reliability of identification testimony; rather, the trier of fact is to take all of the factors into consideration." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47. A discrepancy or omission in a witness' description of the offender does not, standing alone, create reasonable doubt provided a positive

identification has been made. *Slim*, 127 Ill. 2d at 309. Applying the identification factors, Williams' identification of defendant as the shooter was sufficiently reliable.

¶ 47   Regarding the first factor, Williams had ample opportunity to view defendant during the shooting, observing the shooter's face throughout almost the entire encounter, except for the few seconds when he ran to stand over Walker after he fell onto the grass. During the encounter, defendant "kind of got close" to Williams, made eye contact with her, and paused "a little bit" when she asked him to "please stop." She was an arm's reach away from defendant when he stood over Walker on the grass shooting and "[b]asically just finished him off." The shooting occurred in the middle of the afternoon while light outside, nothing blocked Williams' view of defendant, and his face was not obscured by his hood. Although defendant contends that the incident was too brief for Williams to make a reliable identification, the length of the encounter was long enough for her to make a positive identification of the shooter, where she observed the shooter as he ran towards her and Walker after exiting the van, ran beside him, and stood next to him. See *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 32 (rejecting the defendant's contention that an incident lasting less than a minute was too quick to make an accurate identification).

¶ 48   Regarding the second factor, Williams indicated that her attention was on the shooter when he exited the van, finding it strange for someone to exit a vehicle at a stop sign. She described defendant's clothing and explained where defendant was positioned with respect to where she and Walker were moving. Williams described the shooting in detail, recounting defendant's, Walker's, and her own actions and was acutely aware of what was happening during the incident, pleading with defendant to stop.

¶ 49    Regarding the remaining factors, Williams identified the shooter to police minutes after the shooting occurred, naming the shooter as "Harvey from Howard" and identifying defendant in photographs. Williams also consistently identified defendant in a photograph during her ERI, in a photograph in front of the grand jury, and in court. Williams was familiar with defendant as they attended the same high school and were from the same neighborhood. See *People v. Smith*, 362 Ill. App. 3d 1062, 1079 (2005) (finding a witness' identification reliable partly based on her testimony that she recognized the defendant as someone she had occasionally seen on the street); *People v. Williams*, 2015 IL App (1st) 131103, ¶ 74 (affirming the defendant's conviction based in part on an identification made by an eyewitness who knew the defendant by his nickname and had previously met him on "multiple occasions" over the last two years).

¶ 50    Defendant maintains that Williams' prior acquaintance with him from high school years before the shooting rendered her identification unreliable where she had seen him infrequently since then and the day of the shooting was the first time she had seen him in 2015. Defendant argues that Williams could have mistaken defendant for Leroy, whom she did not know, given their similar stature, and that Leroy had a stronger motive to kill Walker based on his brother's killing. However, defendant's theory that he was misidentified for Leroy was explored at trial. The court found Williams "very credible" and her identification reliable. Defendant is essentially asking this court to reweigh the evidence in his favor and substitute our judgment for that of the trier of fact. This we cannot do. See *Jones*, 2019 IL App (1st) 170478, ¶ 25 (this court will not substitute its judgment for that of the trier of fact on issues of credibility or the weight of the evidence).

¶ 51    Taking the identification factors together and viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found Williams' eyewitness identification of defendant as the shooter was reliable. Again, the positive identification by a single witness having ample opportunity to observe the offender is sufficient to sustain a conviction. *People v. Conway*, 2023 IL 127670, ¶ 18. Williams' repeated positive identification of defendant as the shooter provides that evidence. We cannot say that Williams' identification of defendant as the shooter was so improbable, unreasonable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt of first degree murder.

¶ 52    Defendant further argues that the State's remaining evidence was not sufficient to corroborate Williams' "doubtful" identification. Because the court deemed Williams' identification reliable, that alone is sufficient to sustain his conviction. See *Joiner*, 2018 IL App (1st) 150343, ¶ 47. In any event, the video evidence corroborates Williams' testimony, showing that the incident occurred exactly as she described. Specifically, the video shows Williams running on the street alongside defendant as he chases after Walker and then approaching defendant on the grass after he shot Walker. Her proximity to defendant as shown in the video permits a rational trier of fact to reasonably find that she observed the shooter's face long enough to positively identify him as the man she knew from school and the neighborhood.

¶ 53    Similarly, although the court did not find Livingston's or Caref's identifications reliable, it accepted their testimony corroborating Williams' testimony regarding where and when the shooting occurred. Further, Livingston's testimony that a woman was about three feet away from the shooter, screaming and trying to intervene when the shooter stood over Walker lying on the grass, corroborates much of Williams' testimony. As such, there was nothing "unreasonable,

improbable or unsatisfactory" in the court's determination that defendant was the shooter. *Wright*, 2017 IL 119561, ¶ 70.

¶ 54    We will not reverse a conviction simply because the defendant claims a witness was not credible. *Bonaparte*, 2014 IL App (1st) 112209, ¶ 41. Here, looking at all the evidence in the light most favorable to the State as we must, we cannot say it was unreasonable for the trial court as finder of fact to find that defendant was the shooter and therefore guilty of first degree murder beyond a reasonable doubt. See *Conway*, 2023 IL 127670, ¶ 18.

¶ 55                            III. CONCLUSION

¶ 56    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 57    Affirmed.